UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KENNETH WILLIAMS,

        Plaintiff,

      v.

SOUTHERN ILLINOIS RIVERBOAT/
CASINO CRUISES, INC., d/b/a HARRAH'S
METROPOLIS CASINO, *et al.*,

        Defendants.

Case No. 06-cv-664-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by

defendants Southern Illinois Riverboat/Casino Cruises, Inc. ("Harrah's"), James Slone, Jerry

Rednour, Glen Melcher, Lori Cooke and Jason Cecil (collectively, "the Harrah's defendants")

(Doc. 54). Plaintiff Kenneth Williams ("Williams") has responded to the motion (Doc. 73), and

the Harrah's defendants have replied to that response (Doc. 74) and have submitted with their

reply brief a response to the facts cited by Williams (Doc. 75). Williams has also filed a motion

to strike the response to the facts (Doc. 88), to which the Harrah's defendants have responded

(Doc. 92).

## I.    Motion to Strike (Doc. 88)

The Harrah's defendants' response to the facts is a seven-page document that responds to

certain factual allegations made by Williams that they deem misleading or incorrect. Williams

asks the Court to strike it as it results in eleven pages of briefing in reply to his response. In this

district, reply briefs may only be five pages long unless the Court gives permission for a longer

brief. *See* Local Rule 7.1(d). The Court believes that the response to the facts is a part of the

Harrah's defendants' reply to the Williams's response and should be included in the five-page

limit for reply briefs.  Accordingly, the Court  will grant Williams's motion to strike (Doc. 88) and will strike the Harrah's defendants' response to the facts (Doc. 75).

## II.    Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c);  *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);  *Spath*, 211 F.3d at 396.  This standard is applied with special scrutiny in cases that turn on issues of intent and credibility. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion.  *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e)(2);  *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986);  *Michas*, 209 F.3d at 692.  Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a

verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

## III.    Facts

The relevant evidence in this case consists of numerous and differing stories about a sequence of events that happened in the casino in Metropolis, Illinois, owned by defendant Southern Illinois Riverboat/Casino Cruises, Inc. ("Harrah's") on August 27, 2005. The vast majority of the conflicts in the witnesses' recollections of the events involve minor details, such as who was present during which conversations and what exactly was said. Where such details are material to Williams's case, the Court has credited the evidence most favorable to Williams and drawn all the reasonable inferences possible. Where the details are immaterial, as most of the conflicts are, the Court has deciphered the gist of the events and has come up with a coherent story, which follows.

On August 27, 2005, Williams and his wife patronized Harrah's casino. Williams and his wife are black. They had traveled to the casino from Nashville, Tennessee, to take advantage of a complimentary 90-day guest pass to the Diamond Lounge, a "VIP" lounge at the casino. Each Diamond Lounge patron was required to show his or her Diamond Lounge membership card or guest pass at the entrance to the lounge or he would not be allowed to enter. Williams and his wife showed their pass and were admitted to the Diamond Lounge, where they enjoyed the gambling, eating and drinking services. There was only one other black person in the Diamond Lounge while Williams and his wife were there. Around 7:00 that evening, Williams's wife caught the bus back to Nashville, but Williams missed it.

Having missed his bus home, Williams returned to the Diamond Lounge where he met a man from Nashville (the other black man in the Diamond Lounge) who offered to drive

Williams home the following morning. Williams then visited the Total Rewards patron service desk in the casino and found out that the next bus to Nashville would leave at 3:30 the following morning. Knowing he had a while to wait whether he took the bus or carpooled with the man from Nashville, Williams politely asked defendant Jimmie Slone ("Slone"), Harrah's Total Rewards supervisor, for a place to rest while he waited. Believing Williams was asking for a hotel room, Slone told him there were no hotel rooms available because they were sold out of rooms at the hotel from which Harrah's purchased rooms. Williams appeared upset and left the Diamond Lounge. Security guard defendant Jason Cecil ("Cecil") arrived the Diamond Lounge responding to a report of an agitated patron. Slone told Cecil Williams was upset because he missed his bus and could not get a hotel room. Cecil testified that Williams was angry and cursing. Williams, on the other hand, has submitted an affidavit stating he was not angry and did not curse. The video surveillance recording is not helpful. It shows Williams making gestures which a reasonable jury could find to indicate disruptive behavior or simply peaceful but animated talking. Without a sound track, a reasonable jury could find either way.

At some point, Williams attempted to get something to eat in the Diamond Lounge, but when he tried, either Slone or Harrah's casino manager defendant Lori Cooke ("Cooke"), who is also black, or both of them told Williams he could not because he was not a Diamond Lounge member. Irritated, Williams insisted the he had a Diamond Lounge pass but he could not readily locate it.

Cooke spoke to Williams in the lobby outside the Diamond Lounge. She testified that during her conversation with Williams he used a lot of profanity in explaining to her that he had not been allowed back into the Diamond Lounge. Again, in light of Williams's affidavit and the ambiguous video surveillance, for the purposes of this motion, the Court must accept Williams's

4

version of events, that is, that he was calm and respectful.

When Cooke asked Williams for his Diamond Lounge pass, he could not readily locate it. Cooke checked Harrah's computer system and determined that Williams was "Gold," not "Diamond," and was therefore not entitled to admission to the Diamond Lounge without a pass. Cooke then spoke with Slone, Harrah's security supervisor defendant Jerry Rednour ("Rednour") and Cecil about the best way to handle the situation. During that conversation, Williams found his Diamond Lounge pass and when he tried to show it to Cooke, she spoke angrily to Williams, who, according to his own affidavit, continued to remain calm and respectful. Cooke then directed Rednour and Cecil to take him out of the casino.

On the way to the escalator with Rednour and Cecil, Williams approached the Total Rewards desk, held his Diamond Lounge pass in the air, walked back and forth and said loudly, as if making a speech, "I'm a Diamond club member. I don't understand why they're kicking me out." He then turned to Cooke, who was a distance away from him, and said on his way to the escalator, "You're black wanting to be white." Rednour and Cecil continued to accompany Williams up the escalator to the exit and into the parking lot. On the escalator, Williams continued to tell patrons below that he was being kicked out unfairly. En route to the exit, Rednour called defendant Glen Melcher ("Melcher"), Harrah's assistant security director, to advise Melcher he and Cecil were escorting a patron off the boat and to advise the security dispatcher to request assistance from the Metropolis Police Department ("MPD").

Illinois Gaming Board ("IGB") agent defendant Anton Eberhart ("Eberhart"), two MPD officers, defendants Michael Hamilton ("Hamilton") and Don Helm ("Helm"), Melcher, other Harrah's security personnel and two Illinois State Police officers joined Rednour, Cecil and Williams in the parking lot. All of those present were white except Williams, who was scared

because he was the only black person in the group. Once the others arrived, at Eberhart's request, Rednour, Cecil and the others kept a substantial distance – 20 to 30 feet – from Williams and said nothing to him. Rednour pointed Williams out to Eberhart and informed Eberhart that the casino manager had asked Williams to leave the casino and that, in leaving, Williams had become belligerent and had yelled at other casino patrons and had yelled expletives. For about 25 minutes, Eberhart attempted to talk with Williams and calm him down while the others kept their distance. During the conversation Williams meandered around but did not leave the parking lot.

Williams found Eberhart more sympathetic than Harrah's security personnel. When Eberhart asked him to relate what had happened from his perspective, believing Eberhart genuinely cared about him and was concerned about him, Williams told Eberhart in a very respectful way that Harrah's casino personnel had told him to leave the casino, that he had done nothing wrong inside the casino and that he did not understand why he had been thrown out. Eberhart asked him for his driver's license and gave the license to MPD Officer Hamilton.

A number of defendants in this case testified that during Eberhart's conversation with Williams, Williams was yelling and cursing such that some casino patrons appeared alarmed by Williams and kept their distance from him. Williams has given an affidavit statement saying he behaved otherwise. Again, the video surveillance tape is ambiguous in the absence of a sound recording. For the purposes of this motion, the Court must accept as true Williams's statement that he was not cursing or yelling or talking to patrons. Williams does admit, however, that on occasion, while he was talking to Eberhart, Harrah's security guards, who had been tracking him from a distance, began to surround and close in around him. When that happened, Williams told Eberhart in a loud voice, "Keep them back." Eberhart indicated to the security guards that they

should back away from Williams, and each time they complied.

At some point, Hamilton assessed that Eberhart and Williams had come to an impasse. Hamilton had also asked Williams if there was anyone he could call to give Williams a ride home, and Williams answered politely, "No." Without discussing the matter with Eberhart, Hamilton decided arresting Williams was the only course of action remaining. Hamilton asked Williams to come toward him to retrieve his license, and as Williams calmly approached, he sensed he was going to be arrested, so he put his hands out and said, "If you're going to arrest me, arrest me, but please don't hurt me or throw me to the ground." At that point, Eberhart took hold of Williams's arms and put them behind his back, and Hamilton applied handcuffs. Hamilton walked Williams to the squad car, and Helm forced Williams to get in the car when he did not readily do so himself.

Later, Cecil filed with the MPD a "patron incident report" about the incident. In that report, Cecil stated that Williams had been belligerent and verbally abusive to Slone and Cook and that he had witnessed Williams be belligerent and verbally abusive on several other occasions, curse at Cooke, yell at casino patrons at the Total Rewards desk using curse words and threatened Cecil and the other security personnel that he would come back to get him. Since the Court has found Williams was not belligerent or verbally abusive, the Court views Cecil's statement as not true. Cecil's report also concluded by saying that trespass papers were filed against Williams. Hamilton did not actually file any papers until later that evening. The patron incident report was attached to Hamilton's arrest report, but Hamilton did not question Cecil about his patron incident report.

Assistant Security Director Melcher filed an affidavit with the MPD as a victim of the incident stating that the attached police report was true to the best of his knowledge. He signed

the affidavit despite the fact that he did not witness the events prior to his joining the group in the parking lot. Hamilton did not question Melcher about his affidavit.

Patrick Windhorst ("Windhorst"), the Massac County State's Attorney, reviewed the evidence in the case and charged Williams with criminal trespass to real property for remaining on Harrah's property after having been asked to leave by a Harrah's agent and with disorderly conduct for yelling and cursing so as to alarm Cecil and to provoke a breach of the peace. He dismissed the case pursuant to a *nolle prosequi* right before trial because in his estimation the case was not serious enough to expend resources on and other more important cases took precedence. He did not dismiss the charges because he believed Williams was innocent, because he believed there was no probable cause to arrest Williams or because there was some other fatal flaw in his case.

Harrah's banned Williams permanently from its premises. Williams was severely depressed for nine months after his arrest and needed medical treatment.

Williams filed the complaint in this case on August 30, 2006, and amended his pleading on February 13, 2007. The Amended Complaint alleges ten counts against various defendants, including cause of action against the Harrah's defendants for violations of 42 U.S.C. § 1981 (Count I), Title II of the Civil Rights Act, 42 U.S.C. § 2000a (Count II), 42 U.S.C. § 1983 for arresting him without probable cause (Count IV), state false arrest law (Count VI), state malicious prosecution law (Count VIII), state defamation law (Count IX) and state intentional infliction of emotional distress law (Count X). In the pending motion, the Harrah's defendants ask the Court for summary judgment on all counts against them.

**IV.    Analysis**

A.    Count I:  § 1981 Claim

In Count I, Williams claims defendants Harrah's, Cooke, Melcher, Slone, Rednour and Cecil violated 42 U.S.C. § 1981 by ordering him to leave the casino premises (Am. Compl. ¶ 106), banning him from the facilities in the future (Am. Compl. ¶ 107) and refusing him to use the Diamond Lounge (Am. Compl. ¶ 108).

Section 1981 is "a broad-based prohibition (and federal remedy) against racial discrimination in the making and enforcing of contracts."  *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 393 (7th Cir.), *cert granted*, 128 S. Ct. 30 (2007).  It provides, in pertinent part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).  The statute further defines making and enforcing contracts to mean "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.:  42 U.S.C. § 1981(b).  While § 1981 claims are most often brought in connection with the right to contract for employment, plaintiffs can also use the statute to enforce their rights to enter into retail contracts.  *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006);  *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996).

To prevail on a § 1981 claim a plaintiff must prove (1) he is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned at least one of the activities enumerated in the statute, such as making a contract.  *Morris*, 89 F.3d at 413;  *see Pourghoraishi* 449 F.3d at 756.  Purposeful discrimination is an essential part of the claim.  *General Bldg. Contractors Ass'n v.*

*Pennsylvania*, 458 U.S. 375, 391 (1982); *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 312 (7th Cir. 1996). The first and third elements are not in dispute at this time. Consequently, the Court's inquiry focuses on the second element: whether Williams can show the defendants intentionally discriminated against him because of his race.

To allow a plaintiff to demonstrate intentional discrimination, many courts have modified the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to the § 1981 context where, as here, the plaintiff relies on an inference of discrimination. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996). Under the *McDonnell Douglas* approach in the employment context, a plaintiff must first establish a *prima facie* case of discrimination by presenting evidence that: (1) he is a member of a protected class, (2) he was meeting his employer's legitimate expectations, (3) he suffered an adverse employment action and (4) he was treated less favorably than others not in the protected class who were similarly situated. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007); *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003). In the context of the denial of the right to make or enforce a retail contract, the appropriate parallel *prima facie* case is that (1) the plaintiff is of a racial minority, (2) he attempted to make or enforce a contract, (3) the defendant denied him the right to make or enforce the contract and (4) the defendant treated the plaintiff less favorably than other white people who were similarly situated.

A plaintiff's successful demonstration of each of these elements creates a rebuttable presumption of discrimination. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Boumehdi*, 489 F.3d at 790; *Grayson*, 317 F.3d at 748. If the defendant is able to provide evidence of such a reason, the burden shifts back to the

plaintiff to show that the articulated reason is actually a pretext. *Boumehdi,* 489 F.3d at 790; *Grayson*, 317 F.3d at 748. At the pretext stage, the plaintiff need not provide evidence of the defendant's discriminatory motive so long as he provides evidence from which a reasonable trier of fact could find that the proffered reason was not genuine, which would allow the trier of fact to infer discrimination. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147-48 (2000)); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

The Harrah's defendants concede Williams can make out a *prima facie* case. It is also clear that the Harrah's defendants have offered a legitimate, non-discriminatory reason which, if believed, justified their treatment of Williams – his allegedly rude, disruptive and disorderly behavior. Therefore, the Court' inquiry focuses on whether the evidence shows the Harrah's defendants' reason is pretextual. In making this inquiry, the Court is not to determine whether the allegedly discriminatory decision was correct, but whether the plaintiff has presented enough evidence to show that the articulated reason was phony or a lie – that the defendant did not honestly believe in the reason it has proffered. *Forrester*, 453 F.3d at 417; *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 640 (7th Cir. 2001). If it is a lie, a fact-finder would be permitted in infer discrimination, and this case must go to trial.

With respect to Cooke, she argues that she refused Williams entry into the Diamond Lounge because he was not a member and had no pass and that she ejected Williams from the casino because he was rude and disorderly. The evidence, viewed in Williams's favor, shows that he was respectful and did not misbehave during the events in question, and that she continued to refuse Williams entry to the Diamond Lounge even after he produced his Diamond Lounge pass. She then ejected him from the casino even though he had a valid pass to the

Diamond Lounge and had behaved well. A reasonable jury could find that her proffered reasons for refusing Williams entry to the Diamond Lounge and ejecting him from the casino were pretextual and that the phony reason was a pretext for discrimination. This is enough to keep her and Harrah's, her employer, in the case on Count I.

With respect to Slone, he did not allow Williams to use the Diamond Lounge because he was not a member and had no pass. There is no evidence that this was pretext. Slone's only acts to prevent Williams from using the Diamond Lounge occurred before he showed his pass. The presentation of a pass is required before non-members are admitted to the Diamond Lounge, so Williams's failure to show his pass was a legitimate reason for excluding him from the Diamond Lounge. There is no evidence that this was a lie or a phony reason for excluding Williams from the lounge. Summary judgment will be granted for Slone on Count I.

As for Rednour, the evidence does not show Rednour or Cecil were involved in the decision to exclude Williams from the Diamond Lounge after he showed his pass. Consequently, they cannot be liable for that act of exclusion. Their only role was to escort Williams from the casino once Cooke ejected him. Their proffered reason for doing this is because Cooke ordered Williams to leave and asked them to take Williams out. She did not give any explanation to Rednour or Cecil why she gave that order, and there is no evidence that in their decision to comply with her request they possessed any discriminatory motive or were aware of and adopting any discriminatory motive on Cooke's part. There is simply no evidence from which a reasonable jury could find Rednour or Cecil intentionally discriminated against Williams because of his race. For this reason, summary judgment will be granted for Rednour and Cecil on Count I.

To the extent that Williams may be arguing that Cooke, Slone, Rednour and Cecil

conspired to eject Williams from the property on the basis of his race, there is simply no evidence to support a finding of conspiracy. That they talked together before his ejection is not sufficient in the absence of evidence from which a reasonable jury could find that in that conversation, or in any other communication, they conspired to behave unlawfully.

Finally, Melcher played no role in excluding Williams from the Diamond Lounge after he showed his pass or in ejecting Williams from the casino property. To the extent he was present to witness the events in the parking lot, nothing suggests he possessed any intent to discriminate against Williams because of his race. Thus, Melcher cannot be liable for interfering with his right to make and enforce contracts, and summary judgment will be granted in his favor.

B.      Count II:  Title II Claim

In Count II, Williams claims defendants Harrah's, Cooke, Melcher, Slone, Rednour and Cecil violated 42 U.S.C. § 2000a by denying him access to the Diamond Lounge (Am Compl. ¶ 114), expelling him from the casino (Am. Compl. ¶ 115), and banning him from the facilities in the future (Am. Compl. ¶ 119).

Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*, guarantees equal access to places of public accommodation. It provides, in pertinent part, "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race. . . ." 42 U.S.C. § 2000a(a). Only injunctive relief, not damages, is available to a Title II plaintiff. *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402 (1968).

To withstand a summary judgment motion directed towards a Title II claim for discrimination in public accommodations, a plaintiff may proceed again using a modified

*McDonnell Douglas* prima facie case and its ensuing burden-shifting scheme. To establish a *prima facie* case in a Title II action, the plaintiff must show that (1) he was a member of a protected class, (2) that he was not allowed to enjoy a place of public accommodation and (2) that others outside his protected class were allowed to enjoy that place. *See Hornick v. Hoyes*, 708 F.2d 321, 325 n. 8 (7th Cir. 1983). This is essentially the same test applicable to Count I, a claim under 42 U.S.C. § 1981.

This analysis ends up being not remarkably different from the § 1981 analysis discussed above. The reasons given by Harrah's and Cooke for excluding Williams from the Diamond Lounge after he showed his pass and from the casino thereafter could be found by a reasonable jury to be phony. On the other hand, Slone never denied Williams access to the Diamond Lounge after he produced his Diamond Lounge pass, and neither Slone, Rednour, Cecil nor Melcher made any decision to exclude Williams from any other place of public accommodation. Thus, they are entitled to summary judgment. Count II against Harrah's and Cooke will go to trial.[1]

    C.    <u>Count IV: § 1983 Claim</u>

In Count IV, Williams claims the Harrah's defendants acted in concert with MPD Officers Hamilton and Helm and IGB Agent Eberhart to arrest Williams without probable cause (Am. Compl. ¶ 14).

---

[1]Other filings in this case suggest that Williams did not give the notice required by 42 U.S.C. § 2000a-3(c) before filing this lawsuit. If this is, indeed, an issue, the remaining defendants in Count II may adduce relevant evidence at trial and move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) at that time. To the extent that this is a jurisdictional argument, *see Stearnes v. Baur's Opera House, Inc.*, 3 F.3d 1142, 1144 (7th Cir. 1993), the Court directs the parties to file a trial brief on the issue and raise it at trial.

In order to prove a § 1983 claim against an individual, a plaintiff must show that the defendant deprived the plaintiff of rights secured by the Constitution or laws of the United States and that the defendant was acting under color of state law. *Ienco v. City of Chicago*, 286 F.3d 994, 997-98 (7th Cir. 2002); *see Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *McKinney v. Duplain*, 463 F.3d 679, 683 -84 (7th Cir. 2006); *Brokaw v. Mercer Co.*, 235 F.3d 1000, 1009 (7th Cir. 2000). While § 1983 is usually used against public officers, it can also be used against private actors who conspire or act in concert with public officers to deny a plaintiff's civil rights. *Case v. Milewski*, 327 F.3d 564, (7th Cir. 2003); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1352 (7th Cir. 1985). "In order to establish a conspiracy, the plaintiff must demonstrate that the state officials and the private party somehow reached an understanding to deny the plaintiffs their constitutional rights." *Moore*, 754 F.2d at 1352. This is the theory under which Williams seeks to hold the Harrah's defendants liable under§ 1983 for deprivation of his Fourth Amendment right to be free from unreasonable seizure.

A word about unreasonable seizures is in order. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *accord Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000). Probable cause is determined by considering the totality of the circumstances:

> [A] law enforcement officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense. . . . Probable cause, however, does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime. . . . So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists.

*United States v. Sawyer*, 224 F.3d 675, 678-79 (7th Cir. 2000) (internal citations omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152.

Merely calling the police to the scene of a possible crime does not amount to conspiring with law enforcement officers. *Pepper v. Village of Oak Park*, 430 F.3d 805, 811 (7th Cir. 2005). To show concerted action, the plaintiff must actually show that the defendant and a law enforcement officer "somehow reached an understanding to deny the plaintiff[ his] constitutional rights." *Moore*, 754 F.2d 1352. Even providing false information to a law enforcement officer is not sufficient to hold a private party liable under § 1983 absent this understanding. *Id.*

In this case, the communications between the Harrah's defendants and public officers were sparse. The evidence shows that Cooke or Slone called Harrah's security department, and that Harrah's security department later called the MPD and Eberhart for assistance. The calls for assistance indicated falsely that Williams had been disorderly. In addition, Rednour told Eberhart falsely that Williams had been disruptive in the casino but truthfully that Williams had been ejected from the casino. Later that night, Cecil filed a patron incident report that was ultimately included with MPD Officer Hamilton's arrest report. Later, Melcher signed an affidavit stating that he was the victim of the crime for which Williams was arrested even though he did not personally witness many of the events he swore were true and the events he did witness were misrepresented.

None of this amounts to any concerted activity between the Harrah's defendants and a public officer such as a MPD officer or Eberhart. It is important to note that the critical question is not simply whether any of the Harrah's defendants had probable cause to arrest Williams but instead whether they came to an understanding with the MPD officers or Eberhart to arrest

Williams without probable cause. The reaching of an understanding is crucial.

As for Cooke, there is no evidence she even communicated with a public officer, much less came to an understanding with one to violate Williams's civil rights. As for Rednour, Cecil, Slone and Melcher, although they may have communicated with public officers once they arrived in the parking lot, there is simply no evidence from which a reasonable jury could find they came to any understanding that the officers would arrest Williams without probable cause. In fact, the only conversation evidenced in the record is Rednour's brief conversation with Eberhart where he identified Williams and filled Eberhart in, albeit not entirely truthfully, on the prior events of the evening. There is no evidence that in that conversation Rednour and Eberhart came to an understanding to arrest Williams without probable cause. On the contrary, the truthful parts of the conversation provided Eberhart probable cause to arrest Williams at a minimum for criminal trespass to property.

Williams makes much of Cecil's patron incident report and its statement that criminal trespass papers had been filed, as well as Melcher's affidavit stating he was a victim. First, these events happened after the arrest and are not, therefore, probative of any understanding between the Harrah's defendants and public officers prior to the alleged false arrest. Second, Cecil's statement that trespass papers had been filed prior to the time they were actually filed shows at most that Cecil guessed the charges that would be filed or that he was informed of the charges that would be filed. It does not, however, evidence any understanding to violate Williams's civil rights.

As for Harrah's itself, although Williams has alleged a customary plan between the casino and law enforcement to deal with unruly patrons, there is no evidence that any such customary plan, if it existed, involved an understanding to arrest those patrons without probable

cause or any other nefarious undertaking.

For these reasons, the Harrah's defendants are entitled to summary judgment on Count IV.

D.    Count VI:  State Law False Arrest Claim

In Count VI, Williams alleges the Harrah's defendants' reports to law enforcement officers that preceded and followed Williams's arrest constituted false arrest.

"The essential elements of a cause of action for false arrest or false imprisonment are that the plaintiff was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1231 (Ill. 1990).

The Harrah's defendants argue they cannot be liable for false arrest because they did not detain or restrain Williams.  On the contrary, they asked him to leave the casino grounds.  The Court agrees.  The Harrah's defendants did not restrain or arrest Williams and cannot therefore be liable for false arrest.[2]

To the extent Williams seeks to hold the Harrah's defendants liable for conspiring with the MPD defendants or Eberhart to arrest Williams, for the reasons discussed in the prior section of this order, Williams cannot succeed on that theory.

The Harrah's defendants are entitled to summary judgment on Count VI.

E.    Count VIII:  Malicious Prosecution

In Count VIII, Williams alleges that Cecil's patron incident report and Melcher's

---

[2]To the extent that the law may permit a finding of false arrest in a situation where a plaintiff is barred from a place as opposed to confined to a place, Williams has not called that law to our attention and has therefore waived that argument.

18

affidavit stating he was a victim were submitted in malicious attempts to prosecute him.

To succeed on a claim for malicious prosecution, a plaintiff must prove "(1) the commencement or continuation of an original criminal or civil proceeding by defendants, (2) termination of the proceeding in favor of plaintiff, (3) the absence of probable cause for the proceeding, (4) the presence of malice on defendants' part, and (5) damages resulting to plaintiff." *Boyd v. City of Chicago*, 880 N.E.2d 1033, 1045 (Ill. App. Ct. 2007) (citing *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 837 (Ill. App. Ct. 2006)). The Harrah's defendants concede for the purposes of this motion that a criminal prosecution was commenced and that the proceeding was terminated in Williams's favor. It does not believe Williams can prove the other elements of a malicious prosecution claim such as, for example, that the prosecution was commenced *by the defendants*.

Ordinarily criminal prosecutions are commenced by public officers, not individuals. However, private citizens may be liable for malicious prosecution in some instances. While private citizens who unwittingly give false statements to law enforcement officers and do not press the prosecution to proceed are shielded, those who knowingly give false information may be liable for malicious prosecution. *Allen v. Berger*, 784 N.E.2d 367, 370 (Ill. App. Ct. 2002); *Randall v. Lemke*, 726 N.E.2d 183, 185 (Ill. App. Ct. 2000). "[W]hen a person knowingly subjects another to unwarranted criminal prosecution, he or she may be held accountable for the damages that result." *Allen*, 784 N.E.2d at 370.

As a preliminary matter, Williams's claim centers on Cecil's patron incident report and Melcher's victim affidavit. He does not allege that Cooke, Slone or Rednour made any knowingly false report to law enforcement that caused him to be prosecuted or participated in any other way in the commencement or continuation of any proceedings against Williams.

19

Those defendants are entitled to summary judgment because there is no evidence they commenced or continued a proceeding against Williams.[3]

As for Cecil, Melcher and Harrah's, Cecil's patron incident report related instances of disorderly conduct which, if the facts are viewed in Williams's favor, were not true. Since Cecil was a witness to many of these alleged instances, a jury could find that he knowingly made this false report and did so with malice. Similarly, Melcher's affidavit adopted statements in Hamilton's arrest report about Williams's behavior in the parking lot that Melcher witnessed and should have known were untrue, if all evidence is viewed in Williams's favor. Again, a reasonable jury could infer that Melcher's adoption of the false statements was knowing and malicious. For these reasons, the Court cannot grant summary judgment to Cecil, Melcher or Harrah's, their employer, on Count VIII for malicious prosecution.

F.      Count IX:  Defamation

In Count IX, Williams alleges the Harrah's defendants defamed him when Cecil submitted the patron incident report that falsely reported disorderly conduct witnessed by other Harrah's employees and when Melcher signed the affidavit stating he was a victim of Williams's crimes.

"To prove defamation, a plaintiff must show that the defendant made a false statement about him, that there was an unprivileged publication to a third party with fault by the defendant, and that the publication damaged plaintiff." *Vickers v. Abbott Labs.*, 719 N.E.2d 1101, 1107 (Ill. App. Ct. 1999). Statements in the course of judicial or quasi-judicial proceedings and those

_____

[3]It is true that Rednour made a false statement to Eberhart in the parking lot about Williams's behavior in the casino. However, the Amended Complaint does not claim this as a basis for Williams's malicious prosecution claim, and the Court will not treat it as if it did.

necessarily preliminary to those proceedings are absolutely privileged and provide complete immunity from defamation lawsuits even where the statements are made with malice. *Layne v. Builders Plumbing Supply Co.*, 569 N.E.2d 1104, 1106 (Ill. App. Ct. 1991) (citing *Parrillo, Weiss & Moss v. Cashion*, 537 N.E.2d 851, 856 (Ill. App. Ct. 1989)). This is to promote the free flow of such information. *Layne*, 569 N.E.2d at 1106. Reports to law enforcement officers of alleged criminal activities fall within this privilege. *Id.* at 1107 (citing *Starnes v. International Harvester Co.*, 539 N.E.2d 1372 (Ill. App. Ct. 1989); *Dean v. Kirkland*, 23 N.E.2d 180, 188 (Ill. App. Ct. 1939)).

Williams cannot prevail against any of the Harrah's defendants because the reports about which he complains are privileged as statements to law enforcement officers regarding potential criminal activity. Summary judgment will be granted to the Harrah's defendants on Count IX.

G.     Count X:  Intentional Infliction of Emotional Distress

In Count X, Williams alleges the Harrah's defendants intentionally inflicted him with emotional distress when they barred him from the Diamond Lounge and ejected him from the casino on account of his race knowing he had no transportation and no place to go, when they lied to law enforcement officers about his conduct and when they withheld the electronic surveillance tapes from him for at least six months after he was charged.

To prevail in a claim for intentional infliction of emotional distress, a plaintiff must prove "(1) the conduct was truly extreme and outrageous; (2) the actor either intended that his conduct inflict severe emotional distress, or knew that there was a high probability that the conduct would cause severe emotional distress; and (3) the conduct, in fact, caused severe emotional distress." *Reilly v. Wyeth*, 876 N.E.2d 740, 755 (Ill. App. Ct. 2007), *app. denied*, 882 N.E.2d 83 (Ill. 2008). To satisfy the first element, the defendant's conduct must be "so extreme

as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 211 (Ill. 1992). The defendant's acts must be such that when recited to an average member of the community, the person would be resentful against the actor and be led to exclaim, "Outrageous." *See id.*; Restatement (Second) of Torts § 46, Comment d, at 73 (1965).

Even viewing the evidence in Williams's favor, no reasonable jury could find Slone or Rednour behaved in a truly extreme and outrageous way. The most Slone did to Williams was exclude him from the Diamond Lounge before Williams displayed his pass. There is nothing extreme or outrageous about that. Rednour escorted Williams off the boat in a professional and calm manner and witnessed Williams's behavior in the parking lot. His report to Eberhart, which contained a false assessment that Williams had been belligerent on the way out of the casino is not enough to elicit the response, "Outrageous!" Slone and Rednour are entitled to summary judgment on Count X.

As for the other Harrah's defendants, it is possible for a reasonable jury to find their alleged acts of discrimination and malicious prosecution were extreme and outrageous. Therefore, Count X will remain pending against defendants' Harrah's, Cooke, Cecil and Melcher.

## V.     John Doe Defendants

There is no evidence in the record that service of process has been effected upon the John Doe defendants within 120 days after the filing of the complaint, as prescribed by Federal Rule of Civil Procedure 4(m). Accordingly, the Court will order Williams to show cause why his claims against those defendants should not be dismissed without prejudice for failure to timely effect service. Failure to respond in a timely manner to this order will result in dismissal of

those claims. The failure to identify the John Doe defendants during the course of this litigation may not constitute good cause for failing to serve them and may not prevent dismissal of those defendants without prejudice from this action.

## VI. Conclusion

For the foregoing reasons, the Court:

• **GRANTS** Williams's motion to strike (Doc. 88);

• **STRIKES** the Harrah's defendants' response to the facts (Doc. 75);

• **GRANTS in part** and **DENIES in part** the Harrah's defendants' motion for summary judgment (Doc. 54). The motion is granted to the extent it seeks summary judgment on Counts I and II for defendants Cecil, Slone, Rednour and Melcher, on Counts IV, VI and IX for all Harrah's defendants, on Count VIII for defendants Cooke, Slone and Rednour, and on Count X for defendants Slone and Rednour. The following claims remain for trial:
  - Counts I and II against defendants Harrah's and Cooke;
  - Count III and V against defendant Hamilton;
  - Count VIII against defendants Harrah's, Cecil and Melcher; and
  - Count X against defendants Harrah's, Cooke, Cecil and Melcher;

• **ORDERS** the remaining defendants to address at trial whether Williams gave the notice required by 42 U.S.C. § 2000a-3(c) before filing this lawsuit. To the extent that this is a jurisdictional argument, *see Stearnes v. Baur's Opera House, Inc.*, 3 F.3d 1142, 1144 (7th Cir. 1993), the Court directs the parties to file a trial brief on the issue to assist the Court in determining its subject matter jurisdiction to hear Count II;

• **ORDERS** Williams to show cause on or before April 28, 2008, why his claims against the John Doe defendants should not be dismissed without prejudice for failure to timely effect service; and

• **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case. Defendants Slone and Rednour are terminated from this action.

**IT IS SO ORDERED.**
**DATED: April 16, 2008**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

23